# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

—o0o—

| | |
|---|---|
| COREY LOVELL ARNOLD, | 1:04-CV-06325 LJO JMD (HC) |
| Petitioner, | FINDINGS AND RECOMMENDATION REGARDING PETITION FOR WRIT OF HABEAS CORPUS |
| v. | |
| A.A. LAMARQUE, Warden, | [Doc #1] |
| Respondent. | |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. This action has been referred to this court pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72-302.

PROCEDURAL HISTORY

Petitioner is currently in the custody of the California Department of Corrections pursuant to a judgment of the Superior Court of California, County of Tulare, Case No. 56672.

Following a jury trial, Petitioner was sentenced to 28 years four months to life imprisonment for three counts of second degree burglary, using a firearm during the commission

1

1  of the burglaries, and having a prior serious or violent felony conviction, one serious felony
2  conviction, and one prior prison term.
3      Petitioner appealed his conviction to the California Court of Appeal, Fifth Appellate
4  District (hereinafter "Fifth DCA").  The Fifth DCA affirmed the judgment of the trial court.
5  Petitioner thereafter petitioned the California Supreme Court for review on November 26, 2002.
6  The California Supreme Court denied review on January 16, 2003.
7      On October 20, 2003, Petitioner filed a petition for writ of habeas corpus in the Tulare
8  County Superior Court.  The petition was denied on October 21, 2003.
9      On November 4, 2003, Petitioner filed a petition for writ of habeas corpus before the
10  Fifth DCA.   The petition was denied on November 6, 2003.
11      On May 20, 2003, Petitioner filed a petition for writ of habeas corpus in the California
12  Supreme Court.  The petition was denied on September 15, 2004.
13      On September 24, 2004, Petitioner filed the instant petition.  On May 13, 2005,
14  Respondent answered the petition.  On June 8, 2005, Petitioner filed a traverse to Respondent's
15  answer.

## **FACTUAL BACKGROUND**

The Court adopts the facts as recited by the Fifth DCA in its opinion dated October 17, 2002:

> Appellant was charged with committing four armed robberies.  At trial, he challenged the victims' identifications of him as the robber and whether he personally used a gun in the offenses.  Appellant was convicted of counts I, II and IV; the jury was unable to reach a verdict on count III.
>
> <u>Count I</u>
> At approximately 5:20 p.m. on October 4, 1999, Lucas Graham was working as the clerk at "All That Video" on West Caldwell when a man entered the store.  The man was wearing navy blue shorts, white socks, tennis shoes, a multi-colored check print shirt, and a baseball cap.  The shirt was untucked.  The man approached Graham at the counter and asked for "the new Rainman" movie.  Graham thought the request was odd because there was only one "Rainman" movie, and it had been released for several years.  The man then asked if a certain person still owned the video store.  Graham again thought the question was odd because that particular person never owned the store, and explained that to the man.  The man then turned around and walked halfway through the store.
>
> Graham testified the man returned to the counter, lifted up his shirt, and "pulled the gun out."  Graham thought the man's shirt had caught on the gun.  Graham testified he was familiar with guns and saw the man's weapon, and described it as "a blue gun, brown handle.  It was a revolver-type pistol."  Graham testified the man pulled the weapon "about mid chest in [the] stomach area," but didn't lift it up and point it at him.

1        Graham testified the man said to give him all the money, and Graham emptied the cash register of about $217.  The man wadded up the cash and placed it in his pocket.  The man put the gun back in his pants, under his shirt, and walked out of the store.  Graham looked out the door but the man was gone.

        At trial, Graham identified appellant as the robber.  Graham was positive about his identification of appellant.  Graham testified that he observed appellant for "[a]t least a couple [of] minutes" during their conversation about "Rainman" and the video store, and he got a pretty good look at him before he pulled out the gun.  After the robbery, he initially looked at a photographic lineup and selected someone other than appellant, but he was not confident about his selection.  Graham then participated in a live lineup and selected appellant.  He also identified appellant at the preliminary hearing, and he was confident that his identification was correct.

        Also at trial, Graham was extensively cross-examined by defense counsel as to whether he thought the suspect's gun was real.  Graham was a hunter and had been around guns all his life.  He also participated in competitive swimming and was familiar with a starter's pistol.  Graham testified he was about one to two feet from the weapon, and he knew it was not a starter's piston because such a weapon was "a lot thinner and cylindered a lot smaller."  Graham described appellant's gun as a "[r]evolver type.  It had a blued finish, brown handle, like a wood grip handle."  The gun was about six to eight inches long.

        Q.  Do you know whether it was a replica?
        A.  Looked real to me.  Been around them a long time.  It looked very real.
        Q.  As far as touching it, feeling it, it was never shot, was it?
        A.  No, it was never fired.  I didn't want to get fired [at].
        Q.  You don't know whether it was a firearm or not?
        A.  It looked to be a firearm to me.  I didn't want to find out necessarily by getting shot.  So I didn't attempt with anything.
        Q.  Would it be fair to say that could have been a replica and it would have had the same effect on you?
        A.  Obviously it could have been a replica, but I don't think it was."

        On redirect examination, Graham testified there was no doubt that appellant had a real gun.

        Graham was also cross-examined as to whether appellant raised the gun completely out of his pants.  Graham thought appellant lifted the gun so that the barrel was out of his pants, but he didn't see the entire barrel.  Graham conceded that at the preliminary hearing, he testified appellant pulled the gun halfway out of his pants, leaving about half of the gun concealed.

<u>Count II</u>

        At approximately 10:20 p.m. on October 5, 1999, Eric Wood was standing on Encina near Main Street in Visalia, waiting for a friend to get off work at a nearby restaurant.  As Wood waited, he was approached by a man on a silver BMX Schwinn-style bicycle.  Wood described the man as a young Black male, in his early or mid-20's, five feet ten inches tall, and weighed about 165 to 175 pounds.  He was wearing white shoes, white socks, white corduroy shorts, a white T-shirt, and a white fisherman's-type cap, "like Gilligan's hat."

        Wood testified the young man asked for directions to Whitendale and Mooney Boulevard, and also asked for change.  Wood gave him the directions and also gave him a quarter or two.  Wood talked to the man for about 10 minutes.  The man then lifted up his shirt, displayed a bulge in one of his pockets, and told Wood, "Don't scream, don't scream, give me all your money."  The bulge was about six inches, and appellant touched the outside of his pocket.  Wood didn't know what was in the man's pocket but he "figured a weapon of some sort"

because the bulge looked big enough to be a gun.

Wood gave the man all his money, which was about $50, because he figured it was safer than arguing with the man. There was no one else in the area when the man confronted Woods. The man took the money, got on the bicycle, and rode north on Main Street then turned left on Center Street. That was the last time Wood saw the man that night. Wood contacted the police that night and described the suspect.

At trial, Wood identified appellant as the young man on the bicycle, and testified he was certain appellant was the robbery suspect. While it was dark that night, Wood testified there was sufficient light for him to see the person's face. Wood participated in a photographic lineup after the robbery, and he "wasn't certain" when he looked at the photographs the first time, but pointed out a person "that I was fairly certain of. The second time the detective came back I did point out the person I later identified." Wood also observed a live lineup and identified appellant. Wood testified he was certain about his identification of appellant in the live lineup.

At approximately 3:00 a.m. on October 6, 1999, Visalia Police Officer Alisa Jaramillo was on patrol in Visalia when she made contact with appellant. Officer Jaramillo was aware of the robbery of Eric Wood, and testified appellant was about three-quarters of a mile from the site of the robbery. Officer Jaramillo was also aware of Wood's description of the suspect as a Black male adult wearing white shorts, a white shirt, and a white cap. She initially observed appellant walking alone, southbound on Park just south of Murray Street. Appellant was wearing white shorts to the knee, a white shirt, and a white cloth fishing-type cap, which Officer Jaramillo described "as the same type of cap that Gilligan wears on Gilligan's Island."

Officer Jaramillo testified she immediately made contact with appellant because he matched Wood's description of the robbery suspect. He was not on a bicycle, and she never saw a bicycle near him. Another officer arrived as backup and conducted a patdown search of appellant for safety reasons, and no weapons were found.

Officer Jaramillo completed a field interrogation card about appellant's appearance, which indicated he was six feet tall and weighed 170 pounds. She also took photographs of appellant that morning, which were introduced at trial without objection by appellant. Appellant was not arrested or taken into custody at that time.

Count III

At approximately 8:00 p.m. on October 6, 1999, Naibel Baig was working as the clerk at Video Express on West Walnut in Visalia. There were two customers looking at videos when an African-American man entered the store. Baig described the man as about five feet nine inches tall, with a medium build, a little goatee, black shorts, and an untucked black shirt.

Baig testified the man approached the counter and asked Bai g for change for a five dollar bill. Baig replied he might have the change. The man then pulled up his shirt and Baig saw the handle of a gun, and the man said, "'This is a holdup.'" Baig testified the gun had a brown handle. Baig wasn't familiar with guns, but he thought the weapon was like an older revolver, "the six barrel thingy." The gun was black but it wasn't chrome or shiny. Baig testified the gun looked real and did not look plastic.

Baig initially thought the man was joking, but realized he was being robbed when he saw the gun. Baig opened the cash register and gave the money to the man. Baig reached for the one dollar bills, and the man said, "'Just give me the hundred.'" The man reached into the register and took the one hundred dollar bill, and Baig gave him additional cash for a total of $200. The man put the money in his pocket, and put his shirt back over the gun. The man walked out of

4

the store, and baig immediately called the police.

At trial, Baig was unable to identify appellant as the man with the gun, and he didn't know if appellant was the man who robbed him that day.

Count IV

At approximately 1:00 a.m. on October 8, 1999, Brenda Leischner was working as the clerk at the Cleo Rhyme Shell station and minimart on East Noble in Visalia. Leischner was speaking with a customer when a man entered the store. The man was African-American, about five feet eight inches tall, with a medium build. He was wearing a T-shirt, a jacket, and baseball cap. The man approached the counter and pulled up his shirt, and Leischner saw a gun in his waistband. The man placed his hand on the gun ad said, "'This is a robbery.'" Leischner looked down at the gun, then gave them an the currency in the cash register. The man told her to give him the money out of the other cash drawer. Leischner complied and gave him the currency. The man took the money then left the store.

Leischner testified she observed the man's face during the robbery, but "[m]ostly I looked at his eyes." She watched his eyes move to determine if he was going to draw the gun. Leischner was a hunter and familiar with guns, and testified the weapon displayed by the robber was a real gun. She saw the black handle and about half the cylinder of the weapon in the robber's waistband. Leischner testified she was "a hundred percent it was a gun. I will be a hundred percent about that." Leischner conceded some toy guns could look real, but she thought the suspect's weapon was larger than a starter's pistol. Leischner knew the difference between a revolver and a semi-automatic weapon, and believed the suspect had a revolver.

Leischner testified the Shell station was equipped with security video cameras which were functioning at the time of the robbery. At trial, the prosecution introduced the security videotapes into evidence and played them for the jury without objection from appellant. Leischner described the scenes depicted on the videotapes, which were stamped with the time and date and identified the interior of the store and the cashier's booth. Leischner narrated the frames which depicted the robber entering the store, raising his shirt, reaching across the counter for the money, and taking the cash from Leishner.

Leischner participated in both photographic and live lineups, she selected someone other than appellant in both lineups, but she was not one hundred percent certain about her selections. At trial, Leischner testified she could not positively identify appellant as the robber. Appellant was about the same build but seemed taller than the perpetrator.

Visalia Police Officer Kristopher White responded to the Shell station on the robbery dispatch and interviewed Leischner. Officer White also seized the security videotapes and partially reviewed the tapes at the scene. Officer White confirmed that exhibit Nos. 4 and 5 were the tapes he seized from the store. The prosecution again played the videotapes for the jury and Officer White narrated the frames which depicted the robbery suspect standing in a particular position.

The court granted defense counsel's request to move the video screen so appellant could also see the video tape. The court then granted the prosecution's request for appellant assume "the same position" as the suspect in the videotape. Appellant was directed to stand up, put on a dark blue baseball cap, pull down the edge of the cap, and turn his head slightly to the left. Officer White then took a photograph of appellant , and the prosecution introduced it into evidence without objection.

The Investigation

On October 8, 1999, Detective Steven Shear contacted appellant's mother at her apartment on South Santa Fe, and she allowed him to search appellant's bedroom. Detective Shear found several items of clothing similar to the robbery victims' descriptions of the suspect's attire, and the suspect's clothing as depicted

5

on the Shell security videotapes, including a pair of white corduroy shorts, dark colored shorts, and light-colored T-shirts.  The prosecution introduced photographs of appellant's room without objection.

Officer Allen Wightman testified he showed Lucas Graham approximately 700 computized mug shots, two photographic lineups, and one live lineup.  Appellant's picture was in the second photographic lineup.  Graham did not identify anyone from the photographic lineups.  Brenda Leischner also viewed a photographic lineup and selected someone other than appellant.

Officer Wightman supervised the presentation of a live lineup for the victims.  Lucas Graham immediately identified appellant "within second" as the robber.  Officer Wightman asked Graham if he merely recognized appellant from his appearance in the photographic lineup.  Graham replied he didn't recognize appellant at all in the photographic lineup, but immediately recognized him as the robber when he saw him in the live lineup.  According to Officer Wightman, Graham exclaimed "'He's the one who robbed me.'"

Eric Wood separately viewed the same live lineup, looked at the men for about 30 to 60 seconds, then identified appellant as the robber.  Wood stated "he was over 90 percent sure" appellant was the robber.  Brenda Leischner separately observed the same lineup but didn't identify appellant.  She selected a man named Darren Lewis, and said he looked like the suspect.

Officer Wightman testified that during the live lineups, appellant and the other participants were instructed to look straight ahead, turn to the left and right, and always look into the glass.  Appellant was uncooperative and repeatedly looked down during the lineups.  None of the other participants acted that way, and Officer Wightman repeatedly directed him to look forward.  The participants were also asked to wear hats consistent with the suspect's attire.  When appellant put on the hat, he pulled it down to prevent anyone from seeing his face.

Appellant was arrested on October 9, 1999.  After his arrest, there were no longer any reports of robberies occurring under circumstances similar to the crimes in this case.

Defense Evidence

Jeanine West, and employee of the Visalia Police Department, knew Lucas Graham as a family friend.  She spoke with Graham on October 5, 1999, and he told her about the robbery.  Graham also said he forgot to tell the police officer that immediately after the robbery, he observed the suspect walk in the direction of Court and Caldwell, toward the Kingston Apartments on 200 West Caldwell.  Graham was very frightened when he spoke to West.  The next day, West contacted the manager of the apartment complex and obtained the name of a suspect other than appellant.  Officer Wightman testified that West gave him the name of John Paul Jones, and he included that individual's picture in the photographic lineups.

The Special Allegations

While the jury was deliberating the charged offenses, appellant waived his right to a jury trial on the special allegations and submitted the matter on the section 969, subdivision (b) package.

Appellant was convicted of counts I, II and IV.  The jury was unable to reach a verdict on count III and the court declared a mistrial.  Appellant offered to admit all special allegations if the prosecutor dismissed count III.  The prosecutor agreed, and appellant thereafter was advised of and waived his constitutional rights, and admitted the special allegations.  Appellant admitted his prior conviction for burglary in violation of section 458 on August 14, 1995, in Tulare County Superior Court case No. 25110.  At the sentencing hearing, defense counsel urged the court to dismiss the prior strike conviction, but conceded appellant's conviction for burglary was a serious felony within the meaning of the three strikes law.  The court denied the motion.

**DISCUSSION**

I. **Jurisdiction**

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 fn. 7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution. In addition, the conviction challenged arises out of the Fresno County Superior Court, which is located within the jurisdiction of this Court. 28 U.S.C. § 2254(a); 2241(d). Accordingly the Court has jurisdiction over this action.

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997), *cert. denied*, 522 U.S. 1008 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), *quoting* Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir. 1996), *cert. denied*, 520 U.S. 1107 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320 (1997) (holding AEDPA only applicable to cases filed after its enactment). The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

II. **Standard of Review**

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a state court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C . § 2254(a).

The instant petition is reviewed under the provisions of the AEDPA. Lockyer v. Andrade, 538 U.S. 63, 70 (2003). Under the AEDPA, a petition for habeas corpus will not be granted unless the adjudication in question "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding." 28

1  U.S.C. § 2254(d); see Lockyer, 538 U.S. at 70-71; Williams, 529 U.S. at 413.

2  As a threshold matter, this Court must "first decide what constitutes 'clearly established
3  Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at
4  71, *quoting* 28 U.S.C. § 2254(d)(1). In ascertaining "clearly established Federal law," the Court
5  looks to the "holdings, as opposed to the dicta, of [Supreme Court] decisions as of the time of the
6  relevant state-court decision." Id., *quoting* Williams, 592 U.S. at 412. "In other words, 'clearly
7  established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth
8  by the Supreme Court at the time the state court renders its decision." Id.

9  Finally, this Court must consider whether the state court's decision was "contrary to, or
10 involved an unreasonable application of, clearly established Federal law." Lockyer, 538 U.S. at
11 72, *quoting* 28 U.S.C. § 2254(d)(1). "Under the 'contrary to' clause, a federal habeas court may
12 grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme]
13 Court on a question of law or if the state court decides a case differently than [the] Court has on a
14 set of materially indistinguishable facts." Williams, 529 U.S. at 413; see also Lockyer, 538 U.S.
15 at 72. "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the
16 state court identifies the correct governing legal principle from [the] Court's decisions but
17 unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at
18 413.

19 This Court may not issue the writ simply because in its independent judgment the state
20 court decision applied clearly established federal law erroneously or incorrectly; for a writ to
21 issue, 'that application must also be unreasonable." Id. at 411. A federal habeas court making
22 the "unreasonable application" inquiry should ask whether the state court's application of clearly
23 established federal law was 'objectively unreasonable." Id. at 409.

24 Petitioner has the burden of establishing that the decision of the state court is contrary to
25 or involved an unreasonable application of United States Supreme Court precedent. Baylor v.
26 Estelle, 94 F.3d 1321, 1325 (9th Cir. 1996). Although only Supreme Court law is binding on the
27 states, ninth circuit precedent remains relevant persuasive authority in determining whether a
28 state court decision is objectively unreasonable. See Duhaime v. DuCharme, 200 F.3d 597, 600-

01 (9th cir. 1999).

AEDPA requires that this court give considerable deference to state court decisions. The state court's factual findings are presumed correct. 28 U.S.C. § 2254(e)(1). Moreover, we are bound by a state's interpretation of its own laws. Souch v. Schaivo, 289 F.3d 616, 621 (9th Cir. 2002), *cert. denied*, 537 U.S. 859 (2002), *rehearing denied*, 537 U.S. 1149 (2003).

III. **Review of Petitioner's Claims**

    A.    **Claim One:   Juror Misconduct**

In his first claim, Petitioner asserts the trial court erred when it permitted a juror who knew a prosecution witness to remain on the jury. Petitioner further claims his trial counsel was ineffective in failing to object to the empaneling of said juror.

        1.    **Factual Background**

On January 8, 2001, the court conducted voir dire and the jury was selected. However, the transcript reveals that immediately after the jury was sworn, the court stated: "One thing we neglected to do [during voir dire] is have the attorneys name any potential witnesses that they plan on calling in this case. We're going to do that at this time. Pay attention because we're going to ask you if you know any of those people that might be called." After the attorneys read the witness list, two jurors indicated they knew potential witnesses. The first juror indicated that he or she went to school with Lucas Graham. "I don't know him personally. He was a little younger than I was. But I know." In response to the court's questions, the juror stated he or she could judge Graham's testimony the same as anyone else's testimony. Neither the prosecutor nor defense counsel commented or requested to dismiss this juror. The second juror indicated that he or she also know Lucas Graham, but "I don't believe it would be a factor." This juror also knew Officer Kevin White as a friend of the family, but again indicated it would not be a problem. An unreported bench conference then ensued, and the court dismissed the juror because he or she knew Officer White "fairly well." The court randomly selected an alternate to take that juror's place.

        2.    **Clearly Settled Supreme Court Law**

            a.    Juror Conduct

"In all criminal prosecutions," state and federal, "the accused shall enjoy the right to . . . trial . . . by an impartial jury," U.S. Const., Amends. VI and XIV; see Duncan v. Louisiana, 391 U.S. 145 (1968); see also Irvin v. Dowd, 366 U.S. 717 (1961).  However, "due process does not require a new trial every time a juror has been placed in a potentially compromising situation." Smith v. Phillips, 455 U.S. 209, 217 n. 7 (1982).  Instead, due process mandates "a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen." Id.  A question of juror impartiality "depends heavily on the trial court's appraisal of witness credibility and demeanor."  Thompson v. Keohane, 516 U.S. 99, 111 (1995), *citing* Witt, 469 U.S. at 429.  The Supreme Court has reasoned "a trial court is better positioned to make decisions of this genre, and has therefore accorded the judgment of the jurist-observer "presumptive weight. (citation)."  Id.

Even where misconduct has been found, relief is not warranted unless "the misconduct has prejudiced the defendant to the extent that he has not received a fair trial." United States v. Klee, 494 F.2d 394, 396 (9th Cir.), *cert. denied*, 419 U.S. 835 (1974).

                    b.      Ineffective Assistance of Counsel

Ineffective assistance of counsel is based on the Sixth Amendment right to counsel, which exists "in order to protect the fundamental right to a fair trial." Strickland v. Washington, 466 U.S. 668, 684, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).  In a petition for writ of habeas corpus alleging ineffective assistance of counsel, the court must consider two factors.  Id. at 687; Lowry v. Lewis, 21 F.3d 344, 346 (9th Cir. 1994).  First, the petitioner must show that counsel's performance was deficient, requiring a showing that counsel made errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment.  Strickland, 466 U.S. at 687.  The petitioner must show that counsel's representation fell below an objective standard of reasonableness, and must identify counsel's alleged acts or omissions that were not the result of reasonable professional judgment considering the circumstances.  Id. at 688; United States v. Quintero-Barraza, 78 F.3d 1344, 1348 (9th Cir. 1995).  Judicial scrutiny of counsel's performance is highly deferential.  A court indulges a strong presumption that counsel's conduct falls within

the wide range of reasonable professional assistance. Strickland, 466 U.S. 668, 687 (1984); Sanders v. Ratelle, 21 F.3d 1446, 1456 (9th Cir.1994).

Second, the petitioner must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result ... would have been different," 466 U.S., at 694. Petitioner must show that counsel's errors were so egregious as to deprive defendant of a fair trial, one whose result is reliable. Strickland, 466 U.S. at 688. The court must evaluate whether the entire trial was fundamentally unfair or unreliable because of counsel's ineffectiveness. Id.; Quintero-Barraza, 78 F.3d at 1345; United States v. Palomba, 31 F.3d 1356, 1461 (9th Cir. 1994).

A court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the petitioner as a result of the alleged deficiencies. Strickland, 466 U.S. at 697. Since the defendant must affirmatively prove prejudice, any deficiency that does not result in prejudice must necessarily fail. However, there are certain instances which are legally presumed to result in prejudice, e.g., where there has been an actual or constructive denial of the assistance of counsel or where the State has interfered with counsel's assistance. See Strickland, 466 U.S. at 692; United States v. Cronic, 466 U.S., at 659, and n. 25, 104 S.Ct., at 2046-2047, and n. 25 (1984).

### 3.     Review by the State Courts

Petitioner's claim was first presented before the Fifth DCA, which rejected said claim in a reasoned opinion. The court found that the record established that there was no potential issue of juror bias or misconduct. When presented with witness names, the juror in question immediately informed the court of his or her knowledge of witness Lucas Graham. The juror indicated that he or she had only a vague acquaintance with Graham, and affirmed that his or her acquaintance with Graham would not affect his or her deliberations. In contrast, a second juror who was more intimately familiar with a different witness (who was a family friend of the juror) was excused.

### 4.     Analysis of Petitioner's Claim

#### a.     Jury Misconduct

The decision of the Fifth DCA is not contrary to, nor an unreasonable application of

relevant Supreme Court precedent.  First, nothing in the record supports a finding of juror bias or misconduct.  Petitioner speculates that the juror and Graham "might have dated," or that "she probably in my opinion, looked up to him."  Traverse at pp. 2-3.  Petitioner further opines that "she did know him, and stayed in contact with him during the trial."  Id. at 3.  Petitioner goes on to "speculate the juror and Lucas Graham met up" after the trial.  Id. at 4.  The record does not establish that any such relationship or inappropriate contact existed.  Instead, the trial record indicates the juror in question had only a vague acquaintance with Lucas Graham as a younger student at her high school.  Further, the juror's knowledge of witness Graham was discovered before trial, immediately after he became known as a witness, and before the jurors could have had any discussion or contact on Graham's capacity to be truthful.  The juror was asked whether she could judge Graham's testimony impartially, and she indicated that she could judge his testimony the same as anyone else's.  The record is devoid of any evidence either that the juror in question had a more substantial knowledge of the witness than she indicated to the court, or that any juror misconduct occurred as a result of her knowledge of Graham.  Accordingly, Petitioner's jury misconduct claim fails.[1]

### b.      Ineffective Assistance of Counsel

Petitioner's ineffective assistance of counsel claim is likewise without merit.  To demonstrate ineffectiveness based on a failure to object, Petitioner must show that the objection had merit.  United States v. Aguon, 851 F.2d 1158, 1172 (9th Cir. 1988).  Similarly, failure to make what would be a futile motion does not constitute ineffective assistance of counsel.  United States v. Quintera-Barraza, 78 F.3d 1344, 1349 (9th Cir. 1996).  Here, the trial court adequately addressed the issues surrounding jury knowledge of witnesses.  Petitioner's trial counsel properly refrained from objecting to inclusion of the juror who knew witness Graham.  Additionally, Petitioner has not demonstrated that his trial counsel's failure to object to the juror in question had any prejudicial impact on his trial.  Petitioner speculates that the juror in question had a

---

[1] Although it is not necessary to address prejudice given the lack of support for a finding of misconduct, This Court notes that Petitioner has failed to demonstrate any evidence that the alleged misconduct denied him a fair trial.  United States v. Klee 494 F.2d 394, 396 (9th Cir.), cert. denied, 419 U.S. 835 (1974); Brecht v. Abrahamson, 507 U.S. 619, 623 (1993).

desire to "punish the petitioner and to make sure petitioner wouldn't receive a fair trial." Traverse at p. 4. The record is devoid of any indication of such a bias.

The record does not support Petitioner's claim of juror bias and resulting prejudice. Nor does trial counsel's lack of objection to the inclusion of the juror in question constitute ineffective assistance of counsel. Accordingly, Petitioner's claim should be denied.

**B.    Claims Two, Three, and Four: Insufficient Evidence and Ineffective Assistance of Counsel**

In his second claim, Petitioner argues there was insufficient evidence to support his conviction on count IV. Specifically, he challenges the sufficiency of the evidence of identity. In his third claim, Petitioner alleges there was insufficient evidence that he personally used a firearm in counts I and IV. And in his fourth claim, Petitioner argues his trial counsel was ineffective in failing to move to dismiss count IV for insufficient evidence.

**1.    Clearly Settled Supreme Court Law**

a.    Insufficient Evidence Claims

In reviewing sufficiency of evidence claims, California courts expressly follow the Jackson standard articulated in Jackson v. Virginia, 443 U.S. 307 (1979). *See* People v. Johnson, 26 Cal.3d 557, 575-578 (1980); *see also* People v. Thomas, 2 Cal.4th 489, 513 (1992). Pursuant to the Supreme Court's holding in Jackson, the test to determine whether a factual finding is fairly supported by the record is as follows:

> "[W]hether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

Jackson, 443 U.S. at 319; see also Lewis v. Jeffers, 497 U.S. 764, 781 (1990).

Sufficiency of evidence claims are judged by the elements defined by state law. Jackson, 443 U.S. at 324, n.16. This Court must presume the correctness of the state court's factual findings. 28 U.S.C. § 2254(e)(1); Kuhlmann v. Wilson, 477 U.S. 436, 459 (1986). This presumption of correctness applies to state appellate determinations of fact as well as those of the state trial courts. Tinsley v. Borg, 895 F.2d 520, 525 (9th Cir. 1990). Although the presumption of correctness does not apply to state court determinations of legal questions or mixed questions

of law and fact, the facts as found by the state court underlying those determinations are entitled to the presumption. Sumner v. Mata, 455 U.S. 539, 597 (1981).

### b. Ineffective Assistance of Counsel Claims

The standard for reviewing ineffective assistance claims is stated *supra*, pp. 10-11.

## 2. State Court Review

Petitioner first presented these claims before the Fifth DCA, which rejected said claims. Petitioner again presented the claims before the California Supreme Court, which denied review. The ineffective assistance of counsel claim was first presented to the California Supreme Court in a petition for writ of habeas corpus, and was summarily denied. *See* Lodged Doc. 9 and 10.

In reviewing Petitioner's claims, the Fifth DCA articulated the standard of review as follows:

> In assessing the sufficiency of the evidence to sustain a criminal conviction, the reviewing court's task is to review the entire record in the light most favorable to the judgment to determine whether it discloses substantial evidence–that is, evidence that is reasonable, credible, and of solid value–such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. People v. Johnson, 26 Cal.3d 557, 578 (1980); People v. Rodriguez; 20 Cal.4th 1, 11 (1999); People v. Earp 20 Cal.4th 826, 887 (1999). The focus of the substantial evidence test is on the whole record of evidence presented to the trier of fact, rather than on "'isolated bits of evidence.'" Johnson, 26 Cal.3d at 557; People v. Cuevas, 12 Cal.4th 252, 260-261 (1995).
> Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court, which must be convinced of the defendant's guilt beyond a reasonable doubt. People v. Bradford, 15 Cal.4th 1229, 1329 (1997). If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment. Id. Circumstantial evidence may be sufficient to connect a defendant with the crime and to prove his guilt beyond a reasonable doubt. Id.; People v. Stanley, 10 Cal.4th 764, 792-793 (1995); People v. Bean, 46 Cal.3d 919, 932-933 (1988).
> An appellate court must "presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." People v. Reilly, 3 Cal.3d 421, 425 (1970). It must not reweigh the evidence, reappraise the credibility of the witnesses, or resolve factual conflicts, as these are functions reserved for the trier of fact. People v. Pitts, 223 Cal.App.3d 606, 884 (1990). Furthermore, an appellate court may reject the testimony of a witness who was apparently believed by the trier of fact only if that testimony is inherently improbable or impossible of belief. People v. Jackson, 10 Cal.App.4th 13, 21 (1992); People v. Maxwell, 94 Cal.APp.3d 562, 577 (1979). An appellate court may not reverse a conviction for insufficiency of the evidence unless it appears that upon no hypotheses whatever is there sufficient substantial evidence to support the conviction. People v. Bolin, 18 Cal.4th 297, 331 (1998).

The Fifth DCA went on to examine each challenged count. With respect to count I, the court found that Petitioner's conviction was supported by substantial evidence. Fifth DCA Op. At 17. The court noted that although Graham was uncertain during a photographic lineup, he immediately identified Petitioner as the robber "within seconds" of seeing him in the live lineup. Id. Further, the defense testimony of Jeanine West confirmed Graham's statements as to the robber's escape route. Police included a picture of John Paul Jones (suggested by the defense as the actual perpetrator) in the photographic lineup, and there is no evidence Graham identified Jones. The Fifth DCA found that Graham's testimony presented factual questions for the jury's resolution and that the evidence presented was not inherently improbable or impossible of belief.

With respect to count IV, Petitioner argued that Brenda Leischner never identified him as the perpetrator of the robbery and testified that she only looked at the perpetrator's eyes, and never looked at his face. She further testified Petitioner looked different than the perpetrator. The Fifth DCA concluded there was sufficient evidence to support Petitioner's conviction in count IV. Although Leischner was unable to identify Petitioner, the jury was able to view security camera videotapes and make their own factual determination as to whether Petitioner was the perpetrator. The court found the evidence in support of count IV not inherently improbable or impossible of belief.

With respect to the personal use enhancements on counts I and IV[2], Petitioner argued there was no evidence he fired a gun, used force or fear against the victims, or pointed, displayed or used the gun in a menacing manner. Petitioner further argued there was no evidence the weapon observed by the victims was actually a firearm, since the victims never saw the barrel and conceded the weapon could have been a toy or a replica. The Fifth DCA found

---

[2] Cal. Pen. Code § 12022.53 subd. (b) provides for a 10-year enhancement for "any person who is convicted of a felony specified in subdivision (a), and who in the commission of that felony *personally used* a firearm...." (Emphasis added). The court instructed the jury with CALJIC No. 17.19, containing the applicable definitions of "firearm" and "personal use.": "The word 'firearm' includes any device designed to be used as a weapon from which is expelled through a barrel a projectile by the force of any explosion or other form of combustion. The 'firearm' need not be operable. The term 'personally used a firearm,' as used in this instruction, means that the defendant must have intentionally displayed a firearm in a menacing manner, intentionally fired it, or intentionally struck or hit a human being with it."

"overwhelming evidence that [Petitioner] intentionally displayed the weapon in a menacing manner." In count I, Petitioner approached his victim, raised his shirt, displayed the gun, placed his hand on it, and ordered the victim to give him money from the register. Petitioner continued to display the weapon until Graham gave him all the money, then covered the weapon and left the store. Petitioner engaged in the same conduct in count IV, approaching Leischner, raising his shirt, displaying the gun, placing his hand on the weapon, and announcing his intent to rob the store. In both cases Petitioner intentionally displayed the gun and placed his hand on the weapon as he ordered the victims to give him money.

The Fifth DCA further found substantial evidence to support the jury's finding that Petitioner displayed a "firearm" within the meaning of the statute. Witnesses Graham and Leischner testified they were hunters and familiar with guns, and they testified as to their surety that Petitioner displayed a real weapon rather than a toy or a starter's pistol.

### 3.     Analysis of Petitioner's Claims

#### a.     Insufficient Evidence Claims

With respect to Petitioner's insufficient evidence claims, This Court finds that the Fifth DCA articulated and reasonably applied the proper standard for reviewing such claims under Jackson v. Virginia, 443 U.S. 307 (1979). Viewing the evidence in the light most favorable to the prosecution, there is ample evidence on the record to support Petitioner's conviction on all counts. With respect to identity in count I, victim Graham identified Petitioner as the perpetrator "within seconds" of seeing him in a live lineup. Nor did anything in his testimony make it inherently improbable or impossible of belief. With respect to identity in count IV, although victim Leischner was unable to identify Petitioner, there was sufficient evidence to support a finding of guilt in the form of the security camera recordings of the video. The jury was able to view the tapes and make their own factual determination as to the identity of the perpetrator.

With respect to the personal use enhancements in counts I and IV, there is, as the Fifth DCA notes, "overwhelming evidence" that Petitioner intentionally displayed the weapon in a menacing manner. On both occasions he approached his victim, lifted his shirt, displayed the gun, placed his hand on it and ordered his victim to give him money. There is also sufficient

evidence to support a finding that Petitioner displayed a "firearm" within the meaning of the statute. Witnesses Graham and Leischner testified as to their familiarity with firearms and their surety that Petitioner had displayed a real weapon rather than a toy or starter's pistol.

### b. Ineffective Assistance Claim

Petitioner's ineffective assistance claim fails for the same reasons articulated *supra*, pp. 12-13. Petitioner asserts his trial counsel was ineffective in failing to move to dismiss count IV due to insufficient evidence. As noted above, there was sufficient evidence to support Petitioner's conviction on count IV. Any motion to dismiss the count for insufficient evidence would have been futile. Consequently, trial counsel's decision not to pursue such a motion does not constitute ineffective assistance of counsel.

## RECOMMENDATION

Accordingly, the Court HEREBY RECOMMENDS that the petition for writ of habeas corpus be DENIED and the Clerk of the Court be DIRECTED to enter judgment.

These Findings and Recommendations are submitted to the Honorable Lawrence J. Oliver, United States District Court Judge, pursuant to the provisions of 28 U.S.C. section 636 (b)(1)(B) and Rule 72-304 of the Local Rules of Practice for the United States District Court, Eastern District of California.

Within thirty (30) days after being served with a copy, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Replies to the objections shall be served and filed within ten (10) court days (plus three days if served by mail) after service of the objections. The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(c). The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Y1st, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

**Dated:   January 3, 2008**         /s/ John M. Dixon
                                    UNITED STATES MAGISTRATE JUDGE

cd

17